UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| ADELA BLETHEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:11-cv-00277-DBH |
| | ) | |
| MAINEGENERAL REHABILITATION | ) | |
| & NURSING CARE, *et al.*, | ) | |
| | ) | |
| Defendants | ) | |

**RECOMMENDED DECISION**

Plaintiff Adela Blethen, a woman of Mexican ancestry, worked as a Certified Nursing

Assistant at the Gray Birch elder care facility run by Defendants MaineGeneral Rehabilitation &

Nursing Care and MaineGeneral Health (collectively, "MaineGeneral").  During her

employment, Blethen complained of offensive statements made by two elderly female residents.

Viewed objectively, a reasonable person would not have regarded the residents' comments as

unlawful workplace harassment, given the dependent status of the residents who made the

statements, but Blethen maintains that she was subjected to a hostile work environment.  Later

that same year, the Director of Nursing Services advocated the termination of Blethen's

employment based on interviews of residents who complained of rough treatment in her care.

The Human Resources Compliance Officer permitted the termination to go through, but the

President and CEO of MaineGeneral Rehabilitation & Nursing Care concluded in the context of

a grievance that termination was too harsh under the circumstances and that, because Blethen

indicated she did not want to be restored to her former position at Gray Birch, Blethen should

have an opportunity to pursue another CNA position within MaineGeneral as an internal

applicant, barring which eventuality she should be classified as resigned.  After approximately

two and a half months, MaineGeneral's HR Compliance Officer reclassified Blethen as resigned

and eligible for rehire when Blethen had not yet secured another position.  In addition to alleging

that she was subjected to a hostile work environment, Blethen alleges that MaineGeneral

discriminated against her in regard to employment based on her race, color, national origin,

engagement in protected activity, and also based on her engagement in "whistleblower" activity.

MaineGeneral has filed a motion for summary judgment (ECF No. 23), which motion the Court

referred for report and recommendation.[1]  I recommend that the Court grant the motion.

### SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  By local rule, summary judgment facts are introduced by means of "a separate,

short, and concise statement of material facts," which statements must be supported by record

citations.  D. Me. Loc. R. 56(b), (c).  The Court's review of the record is guided by the moving

party's statement, the non-moving party's opposing statement, including any additional

statement, and the moving party's limited reply statement.  D. Me. Loc. R. 56(b), (c), (d);  see

also Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining

"the spirit and purpose" of Local Rule 56).  Appropriate record sources include "depositions,

documents, electronically stored information, affidavits or declarations, stipulations (including

those made for purposes of the motion only), admissions, interrogatory answers, or other

materials."  Fed. R. Civ. P. 56(c)(1)(A).

---

[1]     The parties filed a joint motion requesting oral argument (ECF No. 79) after the Court referred the summary judgment motion.

Because many factual disputes depend on circumstantial evidence, to determine whether a fact is established, circumferentially, the Court will draw all reasonable inferences in favor of the non-movant that can be supported by the record sources she cites. However, where the non-movant bears the burden of proof, she still must present "definite, competent evidence" from which a reasonable person could find in her favor. Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991). If the Court's guided review of the record reveals evidence sufficient to support a judgment in favor of the non-moving party on one or more of her claims, then there is a trial-worthy controversy and summary judgment must be denied to the extent there are supported claims. Unsupported claims are properly dismissed. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

## FACTS

The following recitation of the facts is drawn from Defendants' Amended Statement of Material Facts ("Am. Stmt.," ECF No. 58), Plaintiff's Opposing Statement of Material Facts and Statement of Additional Facts ("Opp. Stmt." or "Add'l Stmt.," ECF No. 62), Defendants' Reply Statement ("Reply Stmt.," ECF No. 76), Plaintiff's Response to Defendants' Requests to Strike (ECF No. 78), and the items of evidence cited therein and attached thereto. Direct review of the evidentiary sources has been limited to statements involving denials and qualifications.

Plaintiff Adela Blethen is Hispanic, a person of color, and of Mexican origin. MaineGeneral hired Blethen to work as a Certified Nursing Assistant (CNA) at its Gray Birch facility in 2006. Gray Birch provides skilled nursing and rehabilitation services, long-term care, and assisted living services. Blethen's normal shift was the 3 p.m. to 11 p.m. shift, though she also worked the 11 p.m. to 7 p.m. shift when asked. (Am. Stmt. ¶¶ 1-4, Opp. Stmt. ¶ 4, Add'l

Stmt ¶ 7.)  Blethen completed training and received certifications as a CNA and Certified

Residential Medication Aide (CRMA) in 2006, and as a phlebotomist in 2009.  In 2007, Blethen

started studying to become a nurse, enrolling in pre-nursing school at the University of Maine at

Augusta, which course of study she continues to the present.  (Add'l Stmt. ¶ 6.)

 During her employment at MaineGeneral, Blethen received annual evaluations in which

she was consistently found to be fully competent to commendable in her job performance.  In her

evaluations at two, four, and six months of employment, Blethen's performance was uniformly

ranked as satisfactory or commendable.  In her 2007 annual evaluation, Blethen received an

overall rating of fully competent and was found fully competent in providing quality personal

care to residents by her supervisor, Registered Nurse Betty Armstrong.  Armstrong ranked

Blethen's performance as commendable on the standards of excellence, service to others, and

empathy.  Armstrong commended Blethen, noting:   "Adela gives individualized care to all her

residents.  She is observant of changes and brings them to the attention of the charge nurse."  In

her 2008 annual evaluation, Blethen received an overall rating of fully competent, and was found

to be "commendable" in providing quality personal care to residents, and demonstrating

sensitivity to residents' comfort and privacy.  Armstrong noted:  "She is especially attentive to

skin and intake issues."  Armstrong also ranked Blethen as commendable in several other areas

including ensuring continuity of care and communications and ensuring implementation of

resident-centered care plans.  Armstrong provided an appraisal that "Adela is very good with the

residents, attentive to needs and concerns. "  In her 2009 annual evaluation, Blethen received an

overall rating of fully competent, and was found "fully competent" in providing quality personal

care to residents, and demonstrating sensitivity to resident comfort and privacy.  Armstrong once

more commended her, stating:  "Adela enjoys caring for people and is an important part of the 3-11 team."  (Id. ¶¶ 1-5.)

MaineGeneral's policy on the prevention and reporting of abuse, neglect, and exploitation defines abuse, physical abuse, and neglect.  Abuse is defined as the "willful infl[i]ction of injury, unreasonable confinement, intimidation, or punishment with resulting physical harm, pain, or mental anguish."  Abuse also "includes the deprivation of goods and/or services that are needed to attain or maintain physical, mental or psychosocial well being."  Physical Abuse "includes hitting, slapping, pinching, and kicking."  Physical abuse "also includes controlling behavior through corporal punishment."  Neglect is defined as the "deprivation of an individual, of goods or services that are necessary to attain or maintain physical, mental and psychosocial well-being."  (Id. ¶¶ 13-16;  Knight Dep. Ex. 1 at 6, ECF No. 68.)

MaineGeneral's policies on discipline and discharge as of 2009 were summarized in the MaineGeneral Health Employee Handbook and Human Resources Policy HR-18, Employee Discipline.  MaineGeneral's discipline policy specified that "MaineGeneral Health will carefully investigate the situation before discipline is decided upon.  As part of this investigation, the employee will have an opportunity to respond to the concerns about her/his conduct and to tell her/his side of the events."  MaineGeneral's policies described in its handbook as of 2009 provided two different sets of responses to unsatisfactory job performance, depending on whether the issue was performance or behavior based.  MaineGeneral's discipline policy prescribed progressive steps to be taken "when an employee's job performance does not meet established standards despite the employee's apparent effort to do the job properly and where the employee has committed no serious performance issues."  Those steps were:  informal coaching,

a letter of clarity specifying the skill that had not improved, a performance improvement plan if improvement was not made, and discharge if sufficient improvement was not made during the period of the performance improvement plan.  MaineGeneral's policy mandated a different progressive discipline for violations or substandard behavior, defined as "when an employee has engaged in conduct which is deliberate and/or negligent and which is unacceptable or violates MaineGeneral Health policies or procedures."  Those steps were:  oral warning, written warning, unpaid disciplinary suspension, and discharge.  Violations of MaineGeneral's abuse or neglect policies may be the basis for discharge for a first offense.  (Add'l Stmt. ¶¶ 8-12;  Employee Handbook Excerpt, Discipline, ECF No. 62-5;  Policy HR-18, ECF No. 62-6.)  The policy does not mandate a lockstep progression and provides that less severe measures may be bypassed depending on the severity of the behavior.  (Reply Stmt. ¶¶ 11-12.)

Gray Birch is not an Alzheimer's facility, but among its population of elderly residents are some with dementia and other mental health issues.  It is not uncommon for patients with dementia to make unkind or profane comments to staff.  Patients with dementia lack self-control or awareness about what they are saying at times.  (Am. Stmt. ¶¶ 49-50.)

On more than one occasion, resident A.X. said to Blethen that she suspected Blethen's mother was a slave and was raped by a white man.  A.X. also referred to Blethen as "black ass" more than ten times throughout Blethen's employment.  Although Blethen objects to certain representations about A.X.'s mental faculties, such as that she suffered dementia, Blethen admits that A.X. frequently asked about a non-existent pregnant cat and whether she could have a kitten and that she often referred to her husband coming to visit and arriving by plane, though this was not happening.  Blethen also admits that A.X. referred to Gray Birch as a "whorehouse,"

expressed a desire to leave, and made a number of sexually inappropriate comments.  (Id. ¶¶ 9-10, 41-44, Opp. Stmt. ¶¶ 10, 41, 44, Add'l Stmt. ¶ 30.)

Another resident, H.Y., repeatedly referred to Blethen as "that Mexican" or "that Mexican girl," with anger in her voice as if it were a derogatory remark and Blethen had asked a nurse to note these comments in H.Y.'s chart.  The nurse observed that it seemed like H.Y. did not like Blethen.  H.Y.'s chart reflects that she suffered from depression and post-traumatic stress disorder.  H.Y. repeatedly expressed a desire to die and her moods varied from day to day. (Am. Stmt. ¶¶ 11, 45, 48, Add'l Stmt. ¶¶ 31-32.)  Blethen objects to a statement MaineGeneral offers in relation to H.Y.'s personal history (allegedly H.Y. is a Holocaust survivor) and a statement concerning a physician's note about H.Y.'s cognition.  (Am. Stmt.  ¶¶ 46-47, Opp. Stmt. ¶¶ 46-47.)  H.Y. commented that Gray Birch was "worse than Hitler's concentration camp" and that "all Americans were worse than Hitler."  (Am. Stmt. ¶ 47.)  H.Y.'s comments about Blethen's national origin and color made Blethen feel sad and offended.  The comments about Blethen's mother made her feel "devastated," in her own words.  On two occasions these statements caused Blethen to cry when she was at home.  (Id. ¶ 12.)

Tim Knight was Director of Nursing Services at Gray Birch during the entire period of Blethen's employment there, but left the facility for other employment in August 2010, after the events giving rise to this action.  (Am. Stmt. ¶¶ 5-6.)  Late in the spring of 2009, after being called "that Mexican girl" by H.Y. while H.Y. was crying on the phone, Blethen went to Knight and told him that H.Y. was not feeling comfortable with Blethen caring for her and that Blethen did not feel comfortable with the arrangement either.  At that meeting, Blethen, whose testimony is credited here,[2] also told Knight about the comments made by A.X. and told him she felt these

_____

[2]      For his part, Knight testified as a Rule 30(b)(6) deponent that his conversation with Blethen did  not include any discussion about race-based comments other than what H.Y. said and that he would have "looked into" it had he

two patients were not comfortable with her care and that this made it uncomfortable for her as well.  (Id. ¶¶ 13-19, 22, Opp. Stmt. ¶¶ 14-15, 19, Add'l Stmt. ¶¶ 32-33.)  Blethen requested a change of assignment so the residents "could feel more comfortable" and so that Blethen would no longer be hurt by the comments.  Blethen hoped that Knight "would find an arrangement that [would] benefit the patient and benefit [Blethen] too."  (Am. Stmt. ¶ 20, Add'l Stmt. ¶¶ 34-35.)  Knight responded that it was "hard sometimes to be different" and said he would "look into it."  (Am. Stmt. ¶ 21.)  A couple of weeks later, Blethen followed up with Knight because her assignment had not changed and she wanted another assignment.  Knight informed her that he was "not there yet" and had not done anything about it, but would look into it and get the social worker involved.  (Id. ¶ 25, Opp. Stmt. ¶ 25, Add'l Stmt. ¶ 37.)  Blethen understood that Knight was working on it.  (Add'l Stmt. ¶ 38.)  It is undisputed that Knight never expressed anger or frustration at Blethen for reporting resident comments.  (Am. Stmt. ¶ 40.)

Another resident reported losing a watch and told Blethen and an African-American CNA with whom Blethen was working that she suspected they had taken it, asserting:  "I know your kind."  (Am. Stmt. ¶ 26, Opp. Stmt. ¶ 26, Add'l Stmt. ¶ 41.)  Blethen's understanding of this patient was that she had "tried to elope from the facility through her window."  (Am. Stmt. ¶ 27.)  Blethen reported the "I know your kind" comment to a charge nurse[3] so it could be documented on the patient's chart as an indication of racism.  Blethen regarded the statement as "just plain racism" and believed it would be mean to continue to expose this resident to something the resident did not like.  Blethen hoped the nurse would follow up and do something to make the resident more comfortable.  The patient in question transferred to an Alzheimer's facility shortly

---

known of comments such as those attributed to A.X.  (Add'l Stmt. ¶¶ 39-40;  Dec. 8, 2011, 30(b)(6) Dep. at 91-93, ECF No. 43.)

[3]      Charge nurses at Gray Birch are "on-the-ground management," responsible for overseeing the care given by CNAs.  They have documentation duties and medication responsibilities, but lack authority to discipline, hire, or fire employees.  (Am. Stmt. ¶¶ 33-34, Opp. Stmt. ¶ 33.)

thereafter.  (Id. ¶¶ 28-32, Opp. Stmt. ¶ 30, Add'l Stmt. ¶ 42.)  Another patient stated in Blethen's

presence during the 2008 presidential election that she did not like "fellows that were colored," a

reference to then-candidate Barack Obama.  Blethen found this comment offensive as well.

(Add'l Stmt. ¶¶ 28-29.)  In her deposition, following on a series of questions concerning her first

interrogatory responses about the residents who made comments and a series of questions about

other residents in her care who did not make offensive comments (Blethen Dep. 11-29, ECF No.

40), Blethen and defense counsel had the following exchange:

> Q     Okay. The comments that these -- the residents made, the ones we just talked
>
> about, you said they made you feel sad.  Did they impact your ability to do your job?
>
> A     No.  But I just didn't want them to be afraid of something that they didn't know.
>
> That's why I think people are afraid of people of color or different nationalities, just don't know.
>
> Q     You felt they were ignorant, is that fair to say?
>
> A     About, you know, my origins.  I don't know if I'm wording it correctly.
>
> Q     No, I think you are.  Did it affect you physically, did you have trouble
> sleeping, for example?
>
> A     No.
>
> Q     Did it ever make you cry?
>
> A     No.
>
> Q     Did you -- did you ever hear any comments about race or national origin
> from Gray Birch employees, not residents, but employees, your coworkers
> or supervisors?
>
> A     No.

(Blethen Dep. at 29-30.)  Based on this colloquy, MaineGeneral states:  "Plaintiff testified that

the comments described above did not impact her ability to perform her job."  (Am. Stmt. ¶ 35.)

Blethen denies this statement.  (Opp. Stmt. ¶ 35.)  What she says is that the question concerning

the comments "we just talked about" was not a reference to all of the comments she described in her deposition prior to the question, only to the comments concerning the Obama candidacy and the missing watch.  She otherwise states that the comments made her uncomfortable and made it difficult for her to provide care to H.Y. and made her twice request a different patient assignment from Knight.  (Id., Add'l Stmt. ¶ 49, Reply Stmt. ¶ 49.)  Blethen adds that these comments made the work environment uncomfortable and interfered with her provision of care to residents. (Add'l Stmt. ¶¶ 45-46.)  She also contends that accusations leveled at her by residents were false and were motivated by racist attitudes.  One such false allegation involves the watch theft, which does not appear to have amounted to anything.  Another involved a claim by H.Y. that Blethen damaged a house plant, which also does not appear to have amounted to anything.  A third involves H.Y.'s allegations of roughness, which are described more below.  (Id. ¶ 47.)  Blethen otherwise admits that she "just didn't want [the residents] to be afraid of something they didn't know" and that she believed people were afraid of people of color or different nationalities because they "just don't know."  Blethen felt the residents making hostile comments were ignorant "about her origins."  (Am. Stmt. ¶ 36.)  At a July 29, 2009, meeting with Knight, Fortin, and Fotter, everyone agreed that it was a good idea for Blethen to ask another CNA to accompany her when providing care to certain residents, particularly if the resident had voiced complaints.  (Add'l Stmt. ¶ 48.)

Defendant has a policy prohibiting discrimination, including harassment based on race and national origin.  The Policy requires supervisors who receive information or have knowledge of or witness behaviors suggesting unlawful harassment to report it immediately to a designated HR Compliance Officer.   (Id. ¶ 37, Opp. Stmt. ¶ 37, Add'l Stmt. ¶ 23;  Policy HR-08 at 4, ECF No. 63-6.)  As of 2009, MaineGeneral's policies protected employees from harassment by

residents/patients.  (Add'l Stmt. ¶ 20;  Employee Handbook Excerpt re. "Sexual & Other

Harassment," ECF No. 62-7.)  MaineGeneral's policy HR-08 as of 2009 required prompt

investigation of all reported allegations of harassment by the HR Compliance Officer or her

designee.  Policy HR-08 provided that MaineGeneral take responsive actions to harassment,

including changing the work assignment of the complainant if she or he consented.  (Add'l Stmt.

¶¶ 24-25.)  MaineGeneral policy HR-08 as of 2009 provided a definition of harassment:

"[u]nlawful harassment can include jokes, comments, gestures, or actions that are based on or

directed at a person because of race, color, religion, gender, gender identity or expression, sexual

orientation, age, national origin, physical or mental disability, or any personal characteristic

protected by law and which tend to create an intimidating, hostile or offensive work

environment."  (Add'l Stmt. ¶ 21.)

Knight was trained on and familiar with the Policy's requirements (Add'l Stmt. ¶ 26), but

never made a report to the HR Compliance Officer about Blethen's concern over the residents'

race-based comments.  According to Knight, he did not interpret Blethen to be complaining of

discrimination or harassment.  (Am. Stmt. ¶¶ 38-39.)  Recall that Knight denies speaking with

Blethen about comments made by residents other than H.Y.  Blethen denies that Knight never

made a report, citing evidence that Knight authored a report in September 2009 to the Maine

Department of Health and Human Services in connection with an investigation into residents'

complaints concerning rough treatment.  The complaints being investigated were aired in the

course of Defendant's interview of residents for purposes of a quality of service survey, called a

Quality Indicator Survey or QIS.  (Opp. Stmt. ¶¶ 38-39;  See also Knight's Investigation Report,

ECF No. 66-2.)  The asserted denial does not establish that Knight made an internal report of

unlawful harassment for purposes of Policy HR-08, but Blethen's point appears to be that

Knight's report would have divulged to others in administration that Blethen had reported
"harassment" by residents, particularly to John Rice, Administrator for MaineGeneral
Rehabilitation & Nursing Care.  In any event, the report only divulges that Knight described
Blethen's assertion that H.Y. referred to her as the "Mexican girl" and reacted negatively to her
because of her race;  no other resident's comments were related.  (Opp. St. ¶¶ 38-39, Add'l Stmt.
¶¶ 105-108.)

      In August and September 2009, Gray Birch was preparing for the QIS, which, for the first
time, would include questions posed to residents regarding roughness and abuse.  (Am. Stmt. ¶
66.)  Shortly ahead of the QIS, in July, MaineGeneral received a complaint in relation to bruising
experienced by a resident moved with the aid of a mechanical lift.  The resident, M.B., was
known to be "resistant to care, kicking and grabbing at staff."  It was determined that Blethen
was on duty and assigned to the patient at the time of the event, though she had a helper.  The
use of the lift was indicated by the patient's care plan.  (Id. ¶¶ 51-55, Opp. Stmt. ¶¶ 51-52, Add'l
Stmt. ¶ 50;  Knight Dep. Ex. 11, ECF No. 70-6;  Fotter Dep. at 17-18, 24, ECF No. 42.)  Nurse
Manager Judy Fortin agreed that the information recorded in M.B.'s chart about the cause of the
bruising did not relate any staff conduct that would constitute abuse, but instead was a patient
interaction problem stemming from a mechanical lift and a patient who was resistant to care.
(Add'l Stmt. ¶ 52.)  In addition to this incident, there was a similar report from another resident
("M.C.") who also complained about being moved with the assistance of a mechanical lift and
this incident was determined to involve Blethen.[4]  (Id. ¶¶ 53-54;  Reply Stmt. ¶ 54.)

      Knight, Fotter, and Fortin met with Blethen on July 29, 2009, to discuss these reports of
"rough" treatment, though Blethen was not informed of who among the residents complained.

---

[4]      Both of these lift-related complaints were made by residents who did not have a history of making
inappropriate comments.

Knight told Blethen that two residents had complained of Blethen being rough in her care. Knight discussed the upcoming Quality Indicator Survey, which would be performed by the state, and shared that he was concerned these same residents might report being treated roughly by Blethen.  (Am. Stmt. ¶¶ 56-58, Opp. Stmt. 56.)  Blethen denied being rough and told Knight that she had no intention to be rough.  (Am. Stmt. ¶ 59, Opp. Stmt. ¶ 59, Add'l Stmt. ¶ 57.) Those assembled for the meeting discussed the negative implications that an abuse complaint could have for Blethen's career and personally.  Knight explained to Blethen that it was crucial for her to know that there are many resources available to help her cope in difficult or stressful situations, which would help protect her and the residents from being in a potentially abusive situation.  (Am. Stmt. ¶¶ 60-61.)  At this meeting, Blethen asked Knight, in the presence of Fotter and Fortin, whether he had done whatever he was going to do to address her concerns with certain patients not being comfortable with her and making "race-based" comments about her. (Am Stmt. ¶ 62, Opp. Stmt. ¶ 62, Add'l Stmt. 58.)  Knight responded that he was not "into it just yet" and had not "done anything yet" and "was working on it."  (Am. Stmt. ¶ 63.)

On August 17, 2009, Blethen received an Employee Discussion Form, which was presented to her as documenting the July 29 meeting.  Blethen asserts that the form is not entirely accurate, particularly in its representation of what she may have said at the meeting. MaineGeneral flags that the form reiterated the importance of Blethen not "getting herself into a situation that could be portrayed as abusive" and that much is supported by the record.  (Id. ¶¶ 64-65, Opp. Stmt. ¶¶ 64-65, Add'l Stmt. ¶¶ 59-60.)  Nurse Manager Judy Fortin testified at her deposition that the discussion form is not, in essence, a warning or a form of discipline, but

rather records the fact that there was a discussion with the employee concerning patient care. (Add'l Stmt. ¶ 56;  Fortin Dep. at 13, ECF No. 41;  Fortin Dep. Ex. 4, ECF No. 26-3. [5])

In August 2009, Gray Birch hired a per diem social worker, Terri Piscura, to perform a mock survey with residents in anticipation of the forthcoming QIS.  (Am. Stmt. ¶ 67.)  Six of the eleven survey respondents indicated that the facility was understaffed and several asserted that the 3 to 11 shift was particularly problematic as to lack of staff.  (Add'l Stmt. ¶¶ 66-67.)  Defendant admits that short staffing causes staff to hurry and that staff try to do a big job in too short a period of time, creating conditions that may lead to rough treatment.  (Id. ¶ 68.)

Seven of the eleven residents interviewed as part of the mock survey reported they were either treated roughly or rudely or had been yelled at by staff members.  (Am. Stmt. ¶ 68.)  Blethen raises a hearsay objection and the objection is sustained to the effect that this evidence does not establish the truth of the matters asserted by the survey respondents.  However, the responses prompted Gray Birch Administrator John Rice and Knight to have Fotter and Fortin follow up with the residents who reported being treated roughly or rudely in order to obtain additional information, such as what happened and who was involved.  (Id. ¶ 69, Opp. St. ¶ 69, Add'l Stmt. ¶ 65.)  Fotter conducted several interviews on September 9, 2009.  (Am. Stmt. ¶ 79.)  On the day prior to these interviews, Knight learned of further difficulties related to Blethen and H.Y.

On September 8, Knight was informed by Fotter that H.Y. had made a complaint that Blethen had been rough with her over the weekend and that H.Y. requested that Blethen no longer provide care to her.  (Id. ¶¶ 71-72.)  Knight did not request a written report from Fotter. (Add'l Stmt. ¶ 80.)  On the same date that Knight received this information, he also met with

---

[5]      Plaintiff mistakenly cited the Fotter Deposition and Fotter Deposition Exhibit 4.  Defendants' request to strike the statement is overruled.

Blethen, who told him that H.Y. had yelled at her and referred to her as "the Mexican girl."[6] (Am. Stmt. ¶ 75.)  Blethen indicated that she had recruited other staff to help, was concerned about getting into trouble in relation to H.Y.'s reaction to her, and felt that the reaction was due to her race.  (Opp. Stmt. ¶ 75, Add'l Stmt. ¶¶ 78, 82.)  Knight talked with Blethen about how different generations have different views and different reactions to different people, "not just based on race," and told her he would follow up with Fotter and with Fortin to discuss her concerns and to strategize as to how to make things better for Blethen and for the residents of the unit, though this was not done.  (Am. Stmt. ¶ 76, Opp. St. ¶ 76, Add'l Stmt. ¶¶ 79, 81.)  Knight reassured Blethen that taking someone with her into the resident's room was a good plan and that they would continue to brainstorm how they could make the process easier for her and for the residents to whom she was assigned.  (Add'l Stmt. ¶ 79.)  Robin Gilpatrick, charge nurse for the 3 to 11 shift, noted on H.Y.'s chart that H.Y. refused Blethen's further care because she believed Blethen had caused harm to a house plant in H.Y.'s room.  Gilpatrick removed Blethen from H.Y.'s assignment based on this development.  (Id. ¶¶ 72, 75.)

On September 9, Fotter conducted her follow-up interviews with five residents[7] who complained of roughness in their responses to Piscura's mock survey.  With the exception of H.Y., none of the residents who complained about being treated roughly had ever made comments to Blethen that Blethen perceived to be racist or offensive.  (Am. Stmt. ¶ 88, Add'l Stmt. ¶ 86.)  In her interviews, Fotter was not responsible to ascertain which members of staff were engaging in objectionable conduct.  Instead, Fotter gathered information of what the

---

[6]   There is a concern about whether Knight spoke first to Fotter or to Blethen, which controversy is addressed later in this narration.  However, Blethen does not deny that she spoke with Knight on this date.  Instead, after raising an objection about the Declaration of Timothy Knight, Blethen qualifies the statement to introduce additional topics of their conversation.  (Opp. St. ¶ 75.)

[7]   It appears that the reference to five people means five people other than H.Y., though Fotter also interviewed H.Y.

residents stated, when the conduct occurred, and the name or description of the individual involved, which information she provided to Knight, who was supposed to investigate the identity of the staff allegedly involved.  (Add'l Stmt. ¶ 87.)  In some cases, Fotter made notations in the patients' charts concerning their allegations, but Fotter did not create a written statement related to her interviews.  Instead, she shared what she heard with Knight in conversation.  (Am. Stmt. ¶¶ 79-80, Opp. St. ¶¶ 79-80, Add'l Stmt. ¶¶ 85, 88-91.)  Knight took notes of Fotter's oral report, reflected in a document titled Resident Interviews—Conducted by Rose Fotter[8] (ECF No. 33-3 or 70-6), and later prepared a report titled Investigation into Resident Complaint and Follow up on Resident Interviews on the North Unit . . . at Gray Birch, which Knight provided to DHHS and which drew on Fotter's oral account and on Knight's own interview with one patient. (Knight Dep. Ex. 12, ECF No. 33-4 or 69-1.)

According to MaineGeneral, the interviews yielded reports[9] of rough treatment by residents whose complaints were directed primarily at Blethen and one other CNA on the night shift, a Caucasian female identified as V.L.  (Am. Stmt. ¶¶ 79-87.)  Blethen objects on hearsay grounds to this presentation (Opp. St. ¶¶ 81-87) and MaineGeneral responds that the statements are offered only to relate that the complaints were made and to explain what Knight did next,[10] which was to call Karen Gallup, Human Resources Compliance Officer, and recommended that both Blethen and V.L. be terminated.  (Am. Stmt. ¶ 89;  Reply Stmt. at 1-2, ECF No. 76.)

---

[8]        The notes pertain to five residents, including "H.Y.," a pseudonym for the resident first named on the list. Evidently, Fotter later interviewed another resident, identified as R.H., another pseudonymous reference, and that interview was not included in Knight's notes.  (Add'l Stmt. ¶ 93.)  This makes five residents interviewed by Fotter other than H.Y.

[9]        Blethen admits that none of the residents interviewed by Fotter and Knight ever made racially insensitive comments to her.  (Am. Stmt. ¶ 88.)

[10]        MaineGeneral also introduces a supplemental declaration from Timothy Knight to lay the foundation for application of the business records exception to the hearsay rule.  According to Knight, it is his regular practice to take notes in relation to investigations into complaints, including what is said to him by fellow investigators.  (Supp. Decl. of Timothy Knight ¶ 3, ECF No. 77;  Reply Stmt. at 2.)

Administrative Director Connie MacDonald and Administrator Rice also supported terminating both Blethen and V.L.  (Am. Stmt. ¶ 90.)

On September 9, 2010, Knight called DHHS and reported that two CNAs, Blethen and V.L., were implicated in suspected abuse of residents.  (Id. ¶ 91.)  MaineGeneral states that Knight made this call because he is a mandatory reporter under state and federal law.  (Id. ¶ 92.)  Blethen denies this assertion and cross references all of her own statements in her statement of additional facts.  (Opp. St. ¶ 92.)  Knight then faxed his written investigation summary to DHHS.  In his summary, Knight identified Blethen by her full name but identified V.L. only by her first name.  (Am. Stmt. ¶ 93, Opp. St. ¶ 93, Add'l Stmt. ¶ 109;  Knight Dep. Ex. 12.)  In his summary, Knight also indicated that he had requested termination of both employees and was awaiting final approval from HR to proceed.  (Am. Stmt. ¶ 94.)

Blethen asserts that Knight wrote his report to DHHS in a manner designed to suggest that Blethen came to him concerning H.Y. before Knight had heard from Fotter about H.Y.'s allegations.  She does this to support an inference that Knight was changing his account of the events on September 8 to make Blethen look bad, though it is not evident why Blethen's self-report would look better or worse based on whether it preceded Fotter's report.  (Add'l Stmt. ¶¶ 76-77.)  The written report for DHHS indicated that Blethen came in to see Knight at 4:00 p.m., which would be within an hour of starting her shift.  (Knight Dep. Ex. 12.)  For its part, MaineGeneral states that Blethen came in to speak to Knight "[s]hortly before or after Fotter went to Knight."  (Am. Stmt. ¶ 75.)  MaineGeneral cites both Knight's Rule 30(b)(6) deposition testimony, in which he clearly testified that he spoke with Fotter first (Dec. 8, 2011 30(b)(6) Dep. at 100:21-25, ECF No. 43), and also Knight's report to DHHS, which is not exactly clear but suggests that Knight spoke with Fotter late in the afternoon and with Blethen at 4:00 p.m.

(Knight Decl. Ex. D, ECF No. 52).  If Knight spoke with Fotter first, it appears that he did not inform Blethen of the fact that H.Y. had complained, which is understandable.

In his declaration in support of MaineGeneral's motion for summary judgment, Knight additionally asserts that he perceived Blethen to be nervous and suspected that she hoped "to preempt any report by H.Y. by proactively addressing the issue with him."  (Am. Stmt. ¶ 77.)  To this, Blethen asserts a denial and cites her entire statement of additional material facts, saying she "can generate a genuine dispute of material fact by relying on circumstantial evidence to rebut the employer's explanation for its adverse action."  (Opp. St. ¶ 77.)

Knight received permission from Gallup and Vice President of Human Resources Rebecca Lamey to terminate Blethen, but not V.L.  (Am. Stmt. ¶ 95.[11])  MaineGeneral has presented declarations from Gallup and Lamey to the effect that they did not support termination of V.L. because, unlike Blethen, V.L. had not yet been counseled for roughness.  (Id. ¶ 96.)  Blethen denies this statement, once more cross-referencing all of the statements in her additional statement.  Blethen also notes that, on September 10, Lamey authored an email related to Knight's request to terminate V.L. in which she indicated that the investigation was designed to follow up on complaints about Blethen and stated:  "If we were presented with a clear complaint as we were with Adele, I would be fine with this termination.   The fact that we want to now terminate [V.L.] because of something residents offered about [V.L.] when questioned about Adela does not seem very defensible to me."[12]  (Opp. St. ¶ 96, Add'l Stmt. ¶ 111;  "Exhibit 15" at 2, ECF No. 69-2.)  In reply, MaineGeneral notes that Knight informed Lamey in a responsive

---

[11]       Blethen qualifies this statement to state that Lamey did not know that Blethen's employment was terminated until September 15, 2009, which does not controvert that Lamey initially approved the termination recommendation.  (Opp. St. ¶ 95.)  The material cited by Blethen includes a September 15 email that Lamey authored (Exhibit 18, ECF No. 28-2) suggesting it would be best to hold off for the present for a full discussion, which indicates that she was not aware as of that date that Knight had already provided Blethen with notice.

[12]       Lamey also noted that V.L. was a per diem employee and recommended to Knight that he "either issue a final written warning . . . or not call her."  ("Exhibit 15," ECF No. 69-2.)

email that the investigation was not specific to Blethen and arose because of a change in the "survey process" at Gray Birch.  (Reply Stmt. ¶ 111;  Exhibit 15 at 2.)  Gallup and Lamey were unaware that Blethen had raised any issues with Knight about residents making racially-charged comments.  (Am. Stmt. ¶ 95.)

Knight terminated Blethen's employment at Gray Birch on September 11, 2009.  (Id. ¶ 97.)  Knight provided Blethen with a Notice of Separation, which stated the cause for termination as "suspected abuse of residents."  (Add'l Stmt. ¶ 112.)  During the termination meeting, Blethen said that she never abused or hurt anyone and that Knight should look into that and she also said she believed the termination was unfair and based on her race.  (Am. Stmt. ¶ 98, Add'l Stmt. ¶¶ 113-114.)  Blethen asked whether she was being terminated because she brought up concerns about people saying racial slurs against her and Knight responded in the negative, stating that it was because she was allegedly abusing patients.  (Am. Stmt. ¶ 99.)

After the meeting, Knight reported to Gallup that Blethen attributed her termination to her Mexican origin.  In an email he indicated that Blethen stated to him that she believed the decision was solely based on her race, because she is Mexican.  (Opp. St. ¶ 99.)  Blethen faults Knight for not indicating in this email that she believed her termination related to her reports of racial slurs by residents, but the evidence does not reflect that she voiced this belief to him.  (Add'l Stmt. ¶¶ 115-116.)  Rather, the cited testimony is to the effect that Blethen subjectively believed (rather than reported) that Knight did not target her for harsh treatment because she is Mexican, but because she complained about residents calling her names.  (Blethen Dep. at 64-65.)  Blethen has also asserted that she believed the residents' comments and reactions to her because of her skin color, national origin, and race were illegal and that they also amounted to

unlawful harassment under MaineGeneral's policies.[13]  (Add'l Stmt. ¶ 163.)  Blethen also states

that she "believed that the termination and the harassment were illegal" when she objected on

September 11, 2009, and when she filed her grievance.[14]  (Add'l Stmt. ¶ 164.)  Blethen also

states that Gallup "did nothing" in response to Knight's report, which report included

information that Blethen regarded her termination as discriminatory.  (Add'l Stmt. ¶ 117.)

Four days after Blethen's termination, on September 15, Knight wrote to Human

Resources and stated that Blethen might view the decision not to terminate V.L. as evidence of

discrimination and reasserted his view that V.L. be terminated too.  (Am. Stmt. ¶ 100.)  In his

email, he wrote:  "What if Adela proceeds with a Human Rights complaint (as we are all too

familiar with) and we have to say that although the complaints were the same from various

patients that we chose to proceed with the termination of 'the Mexican girl', but not the other

CNA.  Just another thought . . ."[15]  (Opp. St. ¶ 100, Add'l Stmt. ¶ 118;  "Exhibit 18," ECF No.

28-2.)  In light of Knight's stated concern about a discrimination charge, Lamey, who did not

understand that Blethen had already been terminated, suggested holding off on Blethen's

termination for a "full discussion."  (Am. Stmt. ¶ 101.)  Lamey also was concerned about

Blethen pursuing a discrimination complaint.  (Add'l Stmt. ¶ 124.)  Gallup, who did understand

that Blethen had already been terminated, communicated to the group that Blethen had filed a

---

[13]     In her additional statement, Blethen neglected to provide a citation for this statement and MaineGeneral
sought its exclusion on that basis.  Blethen supplied the citation in response to MaineGeneral's request to strike the
statement, referencing an affidavit she submitted along with her opposition statement and additional statement.
(Pl.'s Rule 56(e) Responses to Defs.' Request to Strike ¶ 163, ECF No. 78.)
[14]     One again, Blethen has cited the record in support of her statement, but belatedly, in the context of a
response to a request to strike for failure to cite the record.  (Pl.'s Rule 56(e) Responses to Defs.' Request to Strike ¶
164.)
[15]     In mid-August 2009, MaineGeneral was notified that L.G., an ex-employee of MaineGeneral Rehabilitation
& Nursing Care, had filed a charge of employment discrimination for violation of the Maine Whistleblowers'
Protection Act.  L.G. claimed that he was terminated because he complained, among other things, about
understaffing at MaineGeneral's Gray Birch facility.  Knight provided information on the sequence of events in
L.G.'s case for MaineGeneral's defense, filed September 9, 2009, which was that L.G. had not complained about
understaffing until after Knight had requested permission from MaineGeneral Human Resources to terminate his
employment.  (Add'l Stmt. ¶¶ 61-64.)  Knight testified that he "may have been" referring to that complaint.  (Add'l
Stmt. ¶ 119.)

grievance and suggested the possibility of putting Blethen in "administrative leave" status rather than "termination status" until Blethen's grievance could be resolved.  (Am. Stmt. ¶ 102, Add'l Stmt. ¶ 120.)  The Administrator of Gray Birch, John Rice, also weighed in with a concern about DHHS imposing penalties on the facility or not reimbursing the facility for Medicare services, though his concern is not found in the emails reproduced in Exhibit 18.  (Am. Stmt. ¶ 103.)  Because Blethen grieved her termination, Gallup and Lamey ultimately determined that they should allow the grievance process to run its course.  (Id. ¶ 104.)

On September 17, 2009, Knight interviewed Blethen's fellow CNAs and charge nurse Gilpatrick.  (Add'l Stmt. ¶ 121.)  Blethen relates that Knight's report of the interviews indicates that five of six employees who were asked about rough treatment of residents stated that they considered Blethen's treatment of residents to be rough, though not abusive.  (Id. ¶ 122; "Employee Interviews," ECF No. 68-2.)  Knight also recorded that Gilpatrick, the primary nurse on Blethen's shift, "had not seen anything specific, but that his gut told him that her approach with residents was 'not right'" and that he "always had a 'gut' feeling about Adela Blethen." (Id.)  One CNA who described Blethen as rough also indicated that another CNA of Hispanic origin ("D.C.") may need monitoring and guidance and, based on this, Knight did have a discussion with that employee and recorded the discussion in an employee discussion form. Knight testified at his deposition that was he not aware that this other CNA was Hispanic and did not perceive her as Hispanic.  (Add'l Stmt. ¶ 123, Reply Stmt. ¶ 123.)

On September 25 (as soon as V.L. returned from vacation), Knight delivered to V.L. an employee discussion form regarding the resident complaints about roughness and placed V.L. on a leave of absence.  (Id. ¶ 105.)  V.L. was allowed to return to work some time later after DHHS reported that no federal deficiencies were found in its survey of October 28, 2009, which was

reported to Defendants by letter dated November 5, 2009.  (Id. ¶ 106, Opp. St. ¶ 106.)  The

substance of the notification from DHHS was that allegations of abuse, neglect, and other issues

"were not substantiated."  (Add'l Stmt. ¶ 126.)

Meanwhile, on September 22, 2009, Blethen grieved her termination.  (Am. Stmt. ¶ 107.)

In her grievance, Blethen alleged termination without any just cause, denied ever causing harm

to a patient, and wrote: "The only thing I can imagine might have happened is that there have

been several residents who have uttered racial slurs and other discriminatory things against me, a

Mexican.  This had been an ongoing problem that I asked more than one nurse to witness and

document."  (Id. ¶ 108, Opp. St. ¶ 108.)  In addition to this assertion, Blethen indicated:

> [N]o one has given any specific reason for firing me other than 'suspected abuse
> of residents'.  I know that I have not caused any of the residents who were in my
> care or anywhere else any kind of harm.  I would never abuse anyone in my care
> for any reason.  My plan has always been to work as a CNA until I could become
> an RN which has been a lifelong dream and goal of mine.  I would never be
> neglectful in my duties as I take my career as a caregiver very seriously.  I asked
> repeatedly what I had done wrong to justify my firing and no one ever gave me a
> specific example, instance or even general time frame of when the suspected
> abuse occurred.

(Add'l Stmt. ¶ 127.)  Blethen requested to keep her CNA position with MaineGeneral but not

return to Gray Birch.  (Am. Stmt. ¶ 109, Add'l Stmt. ¶ 129.)  She has testified that she did not

want to return to Gray Birch because she regarded it as a hostile environment.  (Add'l Stmt. ¶

128.)

On October 1, 2009, Nona Boyink, Senior Vice President of MaineGeneral Health and

President and CEO of MaineGeneral Rehabilitation & Nursing Care asked Knight to furnish her

with a detailed chronological review of events to assist her in addressing Blethen's grievance.

Among other matters, Boyink asked Knight to provide dates, names, and details of certain events

he had described, including "the incident in which the resident reported that Adela had said 'I

hear you have been telling stories about me.'"  (Add'l Stmt. ¶ 130.)  On October 5, 2009, Boyink

and Gallup met with Blethen to discuss her grievance.  Blethen told Boyink that a couple

residents were directing offensive racial slurs at her, that she told Knight, and that she had

expected him to solve the issue.  (Am. Stmt. ¶ 111.)  Blethen admits that when Boyink asked

Blethen about the residents' comments, Blethen said "they didn't really mean anything about it,

they're just old people."  (Am. Stmt. ¶ 112, Opp. St. ¶ 112.)  Blethen also admits, however, that

she does not remember whether she downplayed the resident comments in this way to Boyink.

(Am. Stmt. ¶ 113, Opp. St. ¶ 113.)[16]  In the grievance meeting, Blethen disputed that she had

abused anyone.  After meeting with Blethen, Boyink investigated the cause for which she had

been terminated—suspected abuse—by reviewing documentation provided by Knight as well as

Blethen's personnel file, and speaking on the phone with individuals involved.  (Am. Stmt. ¶¶

114-115.)  Defendant states that Boyink recalls that Blethen stated she may have been rough with

people because she sometimes gets in a hurry and she was trying to take care of a lot of patients.

(Id. ¶ 116.)  Blethen does not deny saying this, but offers a qualification that she said any issues

were the result of unintentional conduct on her part.  (Opp. St. ¶ 116, Add'l Stmt. ¶ 137.)

   Boyink believed that the termination of Blethen was a mistake.  (Add'l Stmt. ¶ 140.)  She

concluded that Blethen had not been sufficiently counseled regarding how important it was not to

have that kind of behavior and felt that Blethen had not been given sufficient opportunity to

correct the issues of concern.  Boyink also considered the fact that Blethen was working toward

becoming a nurse and was concerned and interested in her residents and patients.  Boyink also

was concerned that terminating Blethen for alleged abuse would probably end Blethen's career.

(Am. Stmt. ¶¶ 117-118, Opp. St. ¶¶ 117-118, Add'l Stmt. ¶¶ 138-139.)  Boyink resolved the

---

[16]     Blethen's opposition statement has not been cited every time she has admitted a statement.  The opposition
statement is cited for these two admission only because they seem to be inconsistent.

grievance in Blethen's favor and told her, by letter and by phone, that she would not return to

Gray Birch, but could apply to other positions in the MaineGeneral system or, if she could not

find one, resign.  When Boyink communicated her decision to Blethen, Blethen cried with

happiness.  Blethen understood that Boyink's decision meant she would be allowed to apply for

positions as an internal candidate until she found a position.  Boyink's intent was to allow

Blethen to go into another position rather than be fired, and if she could not find another

position, that she be allowed to resign.  Boyink did not fully address Blethen's status in her

decision.  (Am. Stmt. ¶¶ 119-122.)  Nor did Boyink indicate that there would be a time limit on

Blethen's opportunity to seek a transfer as an internal applicant.  (Add'l Stmt. ¶ 142.)  The effect

of the decision was to restore Blethen to employee status,[17] though she did not occupy a position.

(Add'l Stmt. ¶ 141, Reply Stmt. ¶ 141.)

　　　　After the resolution of Blethen's grievance, MaineGeneral did not pursue any further

action in relation to Blethen's allegations of discriminatory comments by residents or

discriminatory treatment in connection with the earlier decision to terminate her employment.

(Add'l Stmt. ¶ 143.)

**Knight's Characterization of Resident Reports**

　　　　Although Blethen raises a hearsay objection related to MaineGeneral's use of Knight's

investigation summary, Blethen herself relies on the document in support of multiple statements.

Blethen identifies that the investigation summary provided to DHHS includes a reference to

someone Blethen describes as R.H.  Blethen flags that Knight's notes of his conversation with

Fotter do not mention this individual, though the resident is described in the report to DHHS and

it is apparent that this resident's complaint was directed at V.L. rather than Blethen.  According

---

[17]　　　Blethen describes her post-grievance status of "current employee status" and MaineGeneral describes it as "active employee status."  (Opp. St. ¶ 141, Reply Stmt. ¶ 141.)

to R.H., V.L. was always rough with him and slapped him on the back although he asked her many times to stop.  (Add'l Stmt. ¶ 93;  ECF No. 69-1.)

In addition, Blethen wants the Court to compare the accounts found in Knight's notes of his interview with Fotter and in his investigation summary for DHHS with a timeline he later drafted for consideration by Senior Vice President Boyink in connection with Blethen's grievance.  (Recall that Boyink was tasked with Blethen's grievance.)  Blethen asserts that Knight changed multiple aspects of the alleged complaints, including substituting her name for that of another aide and changing the substance of the complaints concerning her.  (Add'l Stmt. ¶ 94.)  Defendant qualifies the statement by admitting "there are some differences" but asserting that "they are not material."  (Reply Stmt. ¶ 94.)  The cited timeline is Exhibit 23 from the Rule 30(b)(6) deposition, titled "Information—Adela Blethen, CNA, Timeline of Events Leading to Termination of Employment."  (ECF No. 69-3.)

The second entry in the timeline concerns H.Y. and indicates that on September 8, 2009, H.Y. told Fotter that Adela made the comment to H.Y., "I hear that you have been talking about me."  (Add'l Stmt. ¶ 131;  Ex. 23.)  Blethen denies ever making such a statement and flags the fact that this significant accusation is not found in Knight's notes of his conversation with Fotter. (Id. ¶¶ 132-133.)  Knight reasserted this accusation in another document he prepared after September 11 ("Exhibit 19," ECF No. 68-4.  In that document, Knight wrote that H.Y. reported that Blethen made this remark sometime after Knight had his employee discussion with Blethen in August 2009.  (Id. ¶ 134.)

In the timeline Knight also represents that the person the parties identify as "M.D." stated that Blethen is always in a hurry and does not take the time she should, causing the resident fear and anxiety, whereas Knight's earlier notes from his conversation with Fotter also indicate that

M.D. said "it has gotten better" with respect to Blethen and that V.L. also makes her fearful and causes increased anxiety.  (Add'l Stmt. ¶¶ 97-98.)

Another alleged alteration is that the timeline says resident "D.E." identified Blethen as rude and said that Blethen treated her roughly, whereas the notes concerning Fotter's interview indicate that both Blethen and V.L. are very rough when rolling this resident over, that V.L. has yelled at her, and that both Blethen and V.L. have scolded her for being incontinent.  Blethen also flags that "rudeness" is attributed to Blethen in the timeline, but not explicitly in the notes.  (Id. ¶¶ 99-100.)  Of course, the notes mention scolding someone for incontinence and being rough when rolling her over, which certainly qualifies as rude behavior, as MaineGeneral notes.  (Reply Stmt. ¶ 100.)

Another discrepancy is that Knight's timeline describes "M.C." as saying that Blethen was rude and treated her and others roughly and that Blethen threw her into bed and rushed a transfer to the toilet, hurting M.C. with the strap from the lift, whereas Knight's notes concerning Fotter's interview recount the same alleged events but describe M.C. as stating that "they" were responsible and that it was "primarily [Blethen]."  (Add'l Stmt. ¶¶ 101-102.)  The discrepancy appears to be the "and others" attribution.

Finally, in his timeline Knight reported that "P.F." complained of rough treatment by "the 3-11 staff" and noted that the resident is on Blethen's assignment, whereas Knight's notes of his conversation with Fotter reflect that the resident said it was "primarily night shift, but sometimes during the day time."  (Add'l Stmt. ¶¶ 103-104.)  Here, there really is no discrepancy unless one assumes that the resident was limiting his comment to the overnight shift rather than the 3-11 shift, something that the cited portions of the record cannot establish.  (Reply Stmt. ¶ 104.)

**Internal job search**

Because of the ongoing hostile reactions of residents based on her race and origin, and Knight's failure to provide any relief for her complaints, on September 10, 2009, Blethen applied for an emergency department technician position in another facility of MaineGeneral Health. (Add'l Stmt. ¶ 83.)  Blethen received a phone call from a man asking if she was interested in the position the Monday after she was terminated from Gray Birch.  Blethen responded that she could not take the position at the moment.  MaineGeneral's records include a notation on a "tracking record" that states in relation to Blethen's application for this job:  "9-28-09, advised today that this employee was termed for cause and is not eligible for rehire."  (Id.)

Blethen pursued two other positions following the grievance decision.  However, Blethen expressly waives in her opposition memorandum any claim that she was passed over for these positions because of her membership in a protected category.  For these reasons, the related statements are not related here.  (See Am. Stmt. ¶¶ 123-145.)

**"Resignation"**

In November 2009, Vice President of Human Resources Rebecca Lamey had a discussion with Gallup and indicated that they could not leave Blethen in an indefinite, post-grievance, internal candidate status "forever" and that it was time to change Blethen's status to resignation.  (Am. Stmt. ¶ 150, Opp. St. ¶ 150, Dec. 8, 2011, Rule 30(b)(6) Dep. at 61-63, ECF No. 43 (Gallup testimony).)  Gallup testified that normally a successful grievant will get her position back and that Blethen's post-grievance status of being an internal candidate for transfer without any current position was unlike any ordinary employment status.  (Am. Stmt. ¶¶ 146-147, Opp. St. ¶¶ 146-147;  Dec. 8, 2011, Rule 30(b)(6) Dep. at 64-66.)  Gallup has also testified that leaving Blethen in her post-grievance status was like designating her as active status, even

though she did not currently hold a position, which caused "administrative issues." (Am. Stmt. ¶ 151; Gallup Decl. ¶ 10, ECF No. 36; Defs.' Response to Pl.'s First Set of Interrogatories ¶ 9, ECF No. 65-2.) MaineGeneral notes that Blethen was classified as "active" because she "was not on an approved leave of absence." (Am. Stmt. ¶ 152.) According to MaineGeneral, they could not classify her as on leave because she did not qualify for leave under the applicable leave policies. (Id. ¶ 153.) In support of this policy-based statement, MaineGeneral cites only witness declarations. Blethen, on the other hand, cites the employee handbook, which defines leave as "an excused absence from scheduled work, usually for more than one week," and includes "inactive status leave," and sets a 26-week cap on the duration of such leave. (Opp. St. ¶ 153, Add'l Stmt. ¶¶ 159-161; Employee Handbook Excerpt at 3-5, ECF No. 63-1.) The 26-week cap stated in the employee handbook is not consistent with MaineGeneral's Policy HR-15—attached to Blethen's additional statement—which identifies a limit of 12 weeks for other than military leave, but which also makes no reference to "inactive status leave," which seems most like Blethen's post-grievance status, though it is said that she was regarded as active status post-grievance.[18] (Policy HR-15, ECF No. 63-2.)

Between September and November 2009, Blethen applied for three open positions. (Am. Stmt. ¶ 149.) According to Gallup, there were roughly 97 different openings in this timeframe and it was felt that Blethen had received sufficient opportunity to pursue a new position. (Am.

---

[18]      MaineGeneral offers multiple additional statements about why it was problematic to maintain Plaintiff in active status: "active" employees are scheduled for performance reviews and mandatory trainings and their supervisors show up as out of compliance when they do not receive those things "because they are not actually actively employed"; "active" employees impact the employee count and so create confusion regarding staffing availability; "active" employees are presumed to be actually working and therefore eligible for benefits; with approximately 4,000 employees within the MaineGeneral Health system, Human Resources strives to employ clear guidelines regarding employee status; typically, MaineGeneral does not place employees in an administrative leave status unless they meet certain conditions, including that the status is temporary with a defined end point. (Am. Stmt. ¶¶ 154-159 (emphasis added).) Plaintiff admits these statements.

Stmt. ¶¶ 148, 151, Opp. St. ¶¶ 148, 151;  Gallup Decl. ¶¶ 9-10, ECF No. 36.)[19]  On November

30, 2009, Gallup changed Blethen's status to resignation in lieu of termination, but indicated in

her deposition testimony that this classification left Blethen eligible for rehire.  (Am. Stmt. ¶ 162,

Opp. St. ¶ 162, Add'l Stmt. ¶ 162;  Dec. 8, 2011, 30(b)(6) Dep. at 60-61.)  Gallup then

communicated this to Blethen, along with the message that Blethen would be permitted to

continue pursuing a second nursing unit assistant position, which had not yet been awarded to

another candidate.  (Am. Stmt. ¶ 162.)

Blethen did not subsequently apply for any position within the MaineGeneral Health

system.  (Am. Stmt. ¶ 163.)  Blethen offers numerous statements associated with the fact that

Gallup made the decision to classify Blethen as resigned, without prior consultation with Boyink.

(Add'l Stmt. ¶¶ 149-158.)  Blethen states that MaineGeneral's grievance policy does not

authorize human resources to "reverse" the grievance decision made by a vice president.  (Add'l

Stmt. ¶ 149.)  MaineGeneral responds that Boyink approved of the decision and that the decision

did not reverse Boyink's determination but rather fulfilled it by classifying Blethen as resigned

after a chance to obtain a transfer.  (Reply Stmt. ¶ 149.)  Blethen also states that MaineGeneral's

treatment of her in this regard—restoration to allow for internal applicant status without an

existing job—was unique and she was the only employee to occupy this status.  (Add'l Stmt. ¶¶

150-151.)  Typical remedies for a successful grievant under MaineGeneral's Policy HR-19 are

back pay, award of a position that should have been received, rescission or revision of discipline,

reinstatement to a position, and/or change in the employee's file.  (Id. ¶ 147.)  The Policy also

calls for the decision maker to issue a written decision.  (Id. ¶ 148.)  Blethen observes that she

did not actually resign.  (Id. ¶ 165.)

---

[19]     Plaintiff asserts denials for paragraphs 148 and 151 rather than qualifications.  I have essentially reworded
the statements as qualified ("according to Gallup") without excluding them altogether.

**Comparators**

Both parties offer a selection of statements under the heading "comparators," which statements describe certain disciplinary sanctions imposed on other employees.  Knight has testified that when he decides whether to terminate an employee for suspected abuse, he considers a lot of factors including the number of allegations, the severity of the abuse, the nature of the complaint, and whether the CNA is receptive to feedback.  (Am. Stmt. ¶ 164.)  Blethen qualifies this statement, noting that Knight can only make a recommendation of termination to human resources who must approve the recommendation.  (Opp. St. ¶ 164, Add'l Stmt. ¶ 166.)

*L.M.*

In June 2007, MaineGeneral directed that a staffing agency not send back a temporary worker who was alleged by a resident to have placed her hands "down the front of her brief." (Am. Stmt. ¶¶ 165-166.)

*A.P.*

In January 2007, MaineGeneral terminated the employment of a CNA with no prior disciplinary concerns following an investigation that led Knight to conclude that the CNA pulled off a resident's wig and laughed about it to the embarrassment of the resident.  (Am. Stmt. ¶¶ 167-169, Add'l Stmt. ¶ 167.)

*V.L.*

V.L., mentioned earlier in this statement of facts, was a per diem employee.  V.L. was returned to work despite roughness complaints surfacing against her in the course of Fotter's September 2009 interviews.  However, additional complaints of roughness were raised in December 2009 and Knight issued a written warning to V.L. and directed staff to no longer call

V.L. to work.  (Am. Stmt. ¶¶ 170-171, 173.)  Gallup later informed V.L. that her employment status was "voluntary resignation."  (Add'l Stmt. ¶ 168.)

*C.L.*

In December 2009 a resident complained of a rough transfer to bed by CNA C.L.  Knight and others interviewed C.L., who described how she performed the lift.  The resident in question had a history of complaining about young CNAs, of attention-seeking behavior, and of assuming the role of victim.  (Am. Stmt. ¶¶ 176-179.)  Knight testified at his deposition that the decision was made not to discipline C.L. because it was "unsubstantiated abuse."  (Opp. St. ¶ 180.) MaineGeneral states that Knight based his decision, in part, on the fact that the resident later indicated that she did not think C.L. was trying to hurt her (Am. Stmt. ¶ 179), but Knight's initial notes concerning the report indicate that he was already disinclined to discipline C.L. based on the resident in question, C.L.'s response when spoken with, and the absence of any performance history related to C.L.  (Opp. St. ¶ 180, Add'l Stmt. ¶ 170;  Knight Dep. Ex. 4, ECF No. 30-2.) C.L. would later be the subject of a roughness allegation in November 2010.  (Am. Stmt. ¶ 181.)

*M.J.*

This CNA, while cleansing a resident, saw a small amount of blood and an open area on the resident's abdominal fold.  M.J. reported it to the charge nurse.  Evidently a raw area opened during cleansing.  The resident refused further care from M.J., but M.J. was not disciplined because she acknowledged her responsibility and there was no evidence of actual rough treatment.  (Am. Stmt. ¶¶ 184-186, Opp. St. ¶¶ 184-186.)  Knight indicated that M.J. "did not go in and open her skin."  However, Judy Fortin's report of May 18, 2010, states that the skin "opened up" while M.J. was cleansing the area.  (Add'l Stmt. ¶ 172.)

*T.S.*

The parties also describe discipline imposed on Blethen and T.S., a Caucasian CNA, in November 2008 related to a failure to respond to a resident's call bell.  (Am. Stmt. ¶ 8, Add'l Stmt. ¶¶ 18-19.)  My review of the record citations fails to divulge any grist for either party's mill.  There does not appear to be any material discrepancy in the treatment given to Blethen or to T.S.  Blethen flags the fact that the resident was on the other CNA's assignment, that the other CNA was on her break when the call for assistance occurred, and that Blethen was unable to answer the call because she could not leave the resident she was with at the time.  The "Letter of Clarity" disciplinary documents do not indicate which CNA had primary responsibility for the resident, but T.S.'s letter accurately indicates that she "chose to take [her] 'scheduled' break, leaving this resident without care during that time," whereas Blethen's letter does not specifically describe Blethen's failure, but states:  "The resident was left without appropriate care during that time."  (ECF Nos. 25-1, 45-1.)  It does not appear that the existence of this prior discipline had any bearing on what MaineGeneral's decision makers did in November 2009 and after in relation to Blethen's employment.  Reading Blethen's deposition, albeit beyond the pages cited by either party, it appears that the resident in question was the mother of a supervisor and "required . . . special treatment."  (Blethen Dep. at 35-37.)

## DISCUSSION

Blethen's amended complaint (ECF No. 10) sets forth four counts.  Count I alleges violations of Title VII of the Civil Rights Act of 1964 based on (1) hostile work environment; (2) discrimination based on race, color, and national origin;  and (3) discrimination based on retaliatory animus arising from complaints of discrimination.  Count II alleges parallel claims under 42 U.S.C. § 1981.  Count III alleges parallel claims under the Maine Human Rights Act.

Count IV alleges a violation of the Maine Whistleblowers' Protection Act based on Blethen's

complaints about racial discrimination.  With the summary judgment motion, MaineGeneral

contends that Blethen cannot generate a genuine issue of material fact in support of any of these

claims.  For reasons that follow, I conclude that Blethen fails to raise a genuine issue in support

of her claims.

## A.    Hostile Work Environment

MaineGeneral's first challenge goes to the hostile work environment claim.

MaineGeneral maintains that the record evidence is not sufficient to allow a jury to find that

Blethen's work conditions exposed her to an actionable hostile work environment.  (Mot. at 8,

ECF No. 23.)  In particular, MaineGeneral argues that derogatory comments made to Blethen

were not threatening given that the residents who made them exhibit, in MaineGeneral's words,

"certain 'failings.'"  (Mot. at 9-10.)  MaineGeneral supports its argument with references to

portions of Blethen's deposition testimony in which she expressed a primary concern over the

residents' wellbeing and suggested that the comments did not impact her ability to do her job.

(Mot. at 10-11.)  MaineGeneral also notes that the comments in question were not pervasive, but

"episodic."  (Mot. at 11.)  In MaineGeneral's words:  "When the residents' comments are

considered in the context of the residents' mental states, Blethen's job, and Blethen's own

testimony regarding the comments, their impact upon her, and her attempts to be reassigned, it is

all the more clear that Blethen did not experience actionable harassment."  (Mot. at 12.)

Blethen, on the other hand, contends that a reasonable jury could regard the residents'

statements as severe or pervasive and rejects the idea that the age or health status of the residents

undermines her claim.  (Pl.'s Opp'n at 12-13, ECF No. 61.)  She maintains that the residents'

treatment of her impeded her performance and exposed her to "false accusations" that "caused

[her] to take defensive actions," including the reassignment requests she made to Knight and her September 10 decision to apply for another position.  (Id. at 14-15.)

Title VII's prohibition against workplace discrimination, whether with respect to "race, color, religion, sex, or national origin" discrimination, includes a prohibition against harassment that gives rise to a "hostile or abusive work environment."  Forrest v. Brinker Int'l Payroll Co., LP, 511 F.3d 225, 228 (1st Cir. 2007) (quoting 42 U.S.C. § 2000e-2(a)(1) and Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986)).  The federal civil rights guarantee of "equal rights under the law" in relation to making and enforcing contracts, 42 U.S.C. § 1981, similarly prohibits hostile or abusive work environments.  Bhatti v. Trs. of Boston Univ., 659 F.3d 64, 70 (1st Cir. 2011).  So too does the Maine Human Rights Act.  Forrest, 511 F.3d at 228 n.1.  All of these statutes can support Blethen's hostile work environment claims, whether the alleged harassment is based on race, color or national origin or based on alleged retaliation for complaining about workplace harassment, Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005), provided that Blethen has evidence of a trial-worthy hostile work environment claim.

To establish the existence of a trial-worthy claim for hostile work environment, Blethen must present evidence (1) that she is in a protected category; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on her membership in the protected category; (4) that the harassment was "sufficiently severe or pervasive" to alter the conditions of her employment and create an abusive work environment; (5) that the harassment was "both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so"; and (6) "that some basis for employer liability has been established."  Forrest, 511 F.3d at 228 (quoting Crowley v. L.L. Bean, Inc., 303 F.3d 387, 395 (1st Cir. 2002)).  "In determining whether a reasonable person would find

particular conduct hostile or abusive, a court must mull the totality of the circumstances, including factors such as the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Noviello, 398 F.3d at 92 (quoting Harris v. Forklift Sys., 510 U.S. 17, 23 (1993)). These standards are imposed to ensure that the statutes do not come to be applied in a way that imposes liability on employers based on a "general civility code," but rather based on conduct that is objectively "extreme" that "amount[s] to a change in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).

It is not necessary that harassment originate with a coworker or supervisor for an employer to be liable for discrimination. An employer can be liable under the law for maintaining a hostile work environment if it subjects an employee to a hostile or abusive environment that is generated by customers or other third parties. Rodriguez-Hernandez v. Miranda-Velez, 132 F.3d 848, 854 (1st Cir. 1998); Bodman v. Maine, 787 F. Supp. 2d 89, 101 (D. Me. 2011). This is because the employer bears responsibility for controlling work conditions. Bodman, 787 F. Supp. 2d at 101 n.15. Where a hostile work environment exists because of third-party conduct, the employer must take "immediate and appropriate corrective action." Id. at 101 (quoting Beckford v. Dep't of Corrs., 605 F.3d 951, 957 (11th Cir. 2010)). However, a failure to take corrective action is not actionable if the harassment in question has not risen to the level of a hostile work environment.   These are separate inquiries under the six-element, hostile work environment standard outlined above.

From an objective standpoint, the offensive remarks attributed to H.Y. and A.X. may well have been more than mere offensive utterances if spoken by co-workers and supervisors, but

they did not reasonably give rise to an objectively hostile or abusive work environment under the circumstances because the record demonstrates that H.Y. and A.X. were elderly, dependent residents at Gray Birch, whose unfortunate attitudes did not present a threat or other significant obstacle to Blethen and whose statements are therefore objectively on the level of mere offensive utterances. This is not to say that harassing statements by a resident in an elder care facility could never give rise to a hostile work environment; only to say that it would be impermissible for a juror to conclude that these particular comments in the mouths of these particular residents rose to the level of being so offensive as to make the work environment hostile or abusive to Blethen. The remaining offensive utterances—one concerning the Obama candidacy and one "I know your kind" statement—were quite clearly isolated episodes in addition to being mere offensive utterances and they do not tip the scales even in combination with the remarks that H.Y. and A.X. allegedly uttered. As far as coworker and supervisor conduct, there is nothing noteworthy to add to the scale. There is no evidence that any of Blethen's co-workers or supervisors made similar remarks or condoned the remarks. What little evidence there is of coworker/supervisor statements—the few statements attributed to Knight counseling Blethen how best to approach H.Y.—were all supportive in nature. Finally, even accepting that Blethen requested that Knight remove H.Y. from her assignment because of H.Y.'s unkind words and H.Y.'s upset over receiving care from Blethen, Knight's failure to act, from an objective standpoint, did not change the terms and conditions of Blethen's employment.[20]

The parties have identified and discussed some precedent involving patient harassment in similar settings. (Mot. at 9-10; Pl.'s Opposition at 12-13.) In <u>Cain v. Blackwell</u>, 246 F.3d 758

---

[20]    This recommendation does not turn on the assertion by MaineGeneral that Blethen conceded in her deposition that the resident comments did not prevent her from being able to do her job. Blethen has offered testimony that could be interpreted in this fashion by the jury, but even if the finder of fact preferred to credit Blethen's other testimony on this question about her subjective experience, the evidence does not permit a reasonable person to find an objectively hostile or abusive work environment.

(5th Cir. 2001), a panel of justices on the Fifth Circuit Court of Appeals affirmed entry of summary judgment against a claim of hostile work environment where the plaintiff endured "crude, humiliating, and insensitive" conduct by an in-home patient receiving around-the-clock services from her employer.  Id. at 760.  The Cain Court concluded that the patient's "unacceptable but pitiable conduct was not so severe or pervasive as to interfere unreasonably with [the plaintiff's] work performance or, given the circumstances, to create an abusive work environment."  Id. at 760-61.  The facts and circumstances of the instant case are not on all fours with those in Cain, but they do portray a less offensive scenario than what the plaintiff in Cain endured.  MaineGeneral also cites another Fifth Circuit Court of Appeals opinion that is consistent with Cain.  In EEOC v. Nexion Health and Broadway, Inc., 199 Fed. Appx. 351 (5th Cir. 2006), another panel of fifth circuit justices similarly affirmed a summary judgment ruling foreclosing a hostile work environment claim where the nursing home employer took no action despite a Schizophrenic resident's propensity to direct "vehement racial slurs" and physical threats at the CNA plaintiff.  Id. at 352.  The Nexion Health Court observed that Cain "does not establish a bright-line rule that employees who care for disabled, elderly patients can never succeed on a title VII claim" and that the "specific circumstances of each harassment claim must be judged to determine whether a reasonable person would find the work environment hostile or abusive."  Id. at 353.  Nevertheless, in upholding the summary judgment decision the Court was guided by "the Cain court's discussion of the unique circumstances involved in caring for mentally diseased elderly patients."  Id.  Although the remarks were highly offensive and discriminatory and were not isolated, considering their speaker the Court reasoned that a hostile work environment claim could not be sustained "absent some objectively detrimental impact on [the plaintiff's] work performance" that was not evident.  Id. at 354.  The Court also considered

it "a vital consideration" that the plaintiff's job "required him to deal with the tragic failings of elderly people whose minds have essentially failed."  Id.  In the Court's view:  "Absorbing occasional verbal abuse from such patients was not merely an inconvenience associated with [the plaintiff's] job;  it was an important part of the job itself."  Id.  The circumstances that Blethen complains about are no more offensive than what the Fifth Circuit considered.  Although Blethen encountered comments from four residents rather than one, the nature of the remarks and behavior simply were not so extreme as to transform her workplace into an objectively hostile or abusive environment.

Blethen maintains that the circumstances of her case are more suggestive of a hostile and abusive environment because she requested a change in her patient assignment and because not all of the Gray Birch residents have dementia.  (Pl.'s Opp'n at 13, ECF No. 61.)  She cites Aguiar v. Bartlesville Care Center, No. 10-5002, 2011 WL 1461541, 2011 U.S. App. Lexis 8427 (10th Cir. 2011) (unpublished), where the Tenth Circuit vacated the entry of summary judgment on a hostile work environment claim.  In Aguiar, the plaintiff was subjected to a steady diet of sexual harassment by an elderly male resident in the employer's eldercare facility, including "routine and consistent" touching and a more aggressive physical assault.  2011 WL 1461541, *5, 2011 U.S. App. Lexis 8427, *15.  The Court observed in its initial factual recitation that the resident in question was able to ambulate throughout the facility and was recently involved in domestic abuse criminal proceedings.  Eventually the resident was referred for psychiatric evaluation, but not before subjecting Aguiar to a significant amount of threatening harassment. 2011 WL 1461541, *1, *4, 2011 U.S. App. Lexis 8427, *3, *11.  Blethen likens her experience to the experience suffered by Aguiar because the resident who accused Blethen of stealing a watch was later referred to an Alzheimer's facility and because Blethen also complained of

unwanted harassment.  However, the facts and circumstances in Aguiar bear little resemblance to the record before the Court here.  There is absolutely no evidence of offensive physical contact in this case and there is not even a suggestion that H.Y., A.X., or any other resident who made an offensive comment to Blethen was even remotely threatening or that their comments should have humiliated Blethen in the workplace.

A final consideration is whether Blethen's retaliation theory somehow changes the complexion of the hostile work environment claim.  In Blethen's view, the fact that she both requested reassignment and followed up with Knight on that possibility demonstrates, objectively, that the harassment negatively impacted her job performance.  (Pl.'s Opp'n at 14-15, citing Billings v. Town of Grafton, 515 F.3d 39, 51 (1st Cir. 2000), and Hernandez-Loring v. Univ. Metro., 233 F.3d 49, 55-56 (1st Cir. 2000).)  However, the record does not support a different outcome in this regard.  As described by Blethen, Knight was essentially unmoved by her request for reassignment, though he offered supportive suggestions.  These suggestions may not have been what Blethen desired, but the record does not depict a scenario in which Knight or anyone else employed by MaineGeneral took steps to negatively impact Blethen's work environment between the time when she complained to Knight and the time when she received notice of her termination.  As the record stands, the first real measure undertaken by a MaineGeneral employee that modified the terms and conditions of Blethen's employment and changed her subjective work experience was the notice of termination delivered by Knight following the QIS-related, follow up interviews.  If that termination notice and the events that transpired after the suspension of Blethen's active employment are sufficient to expose MaineGeneral to liability for discrimination or retaliation, it is not because of a hostile work environment and would turn on the issue of whether the record permits an inferential finding that

the termination decision and subsequent developments were motivated by Blethen's complaints about residents' offensive remarks or by Blethen's race, color, or national origin.  Those legal theories are discussed separately in the next section of this recommended decision.

**B.      Discriminatory or Retaliatory Termination, Suspension, or Forced Resignation**

MaineGeneral argues that summary judgment should enter on Blethen's discrimination claims because its decision to terminate Blethen, followed by its decision to "sustain" her grievance to allow an opportunity for transfer, followed by a "resignation in lieu" final outcome, were all based on a fair inquiry into residents' allegations of rough treatment and there is no evidence of racial bias or evidence that MaineGeneral's justification is a pretext for race, color, or national origin discrimination.  (Mot. at 12-16.)  MaineGeneral separately briefs Blethen's retaliation theory and while the argument follows a parallel track it delves a little more deeply into the facts.  (Mot. at 17-25.)  In the course of this argument, MaineGeneral maintains that the evidence cannot support a finding that those decision makers responsible for hiring in other positions Blethen sought were even aware of protected activity.  (Mot. at 23-24.)  In her opposition memorandum, Blethen advances her cause primarily as a retaliation theory.  (Pl.'s Opp'n at 16-24.)  Blethen maintains that Knight's termination decision did not comply with MaineGeneral's anti-harassment or progressive discipline policies.  (Id. at 18-20.)  In addition, Blethen argues that Knight modified his characterization of events in a way that supports a bias or pretext finding and that MaineGeneral's resolution of the roughness allegations against her was unduly harsh in comparison to its treatment of V.L. and reflects disparate treatment based on protected status.  (Id. at 20-21.)  Blethen also maintains that a jury might reasonably be suspect of MaineGeneral's decision to impose resignation as soon as it did and she also contends that there is something improper in MaineGeneral's contention at the summary judgment stage that

the resignation decision was supported by Lamey, given that Gallup previously swore that Gallup made the change in Blethen's status.  (Id. at 23.)  Blethen says that Boyink should have made the decision and that MaineGeneral rushed the resignation decision and should have maintained her on inactive status leave for a longer period of time.  (Id. at 24.)  Blethen argues that the same analysis will support her claim of race, color, or national origin discrimination and that differential treatment of Blethen and V.L., plus evidence of "discipline" given to D.C., the other Hispanic CNA, make it reasonable to find that there was more at work than just retaliatory animus.  (Id. at 24-25).  Finally, at the start of her opposition memorandum, Blethen indicates that she "is not pursuing her claims that MaineGeneral discriminated or retaliated against her by failing to hire her for either of the two positions she applied for after the initial termination of her employment."  (Id. at 1 n.1.)

In addition to prohibiting hostile work environments, Title VII, Section 1981, and the Maine Human Rights Act prohibit employers from imposing a materially adverse employment measure on an employee based on the employee's race, color, or national origin.  42 U.S.C. § 2000e-2(a);  42 U.S.C. § 1981(a);  5 M.R.S. § 4572(1).  These statutes and the Maine Whistleblowers' Protection Act also prohibit an employer from taking a materially adverse employment measure based on the employee's complaint of or opposition to racial harassment or discrimination experienced in the workplace.  CBOCS West, Inc. v. Humphries, 553 U.S. 442, 445 (2008) (Section 1981);  Perez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 31 (1st Cir. 2011) (Title VII);  Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 261 (1st Cir. 1999) (Title VII, MHRA, and MWPA);  42 U.S.C. § 2000e-3;  5 M.R.S. § 4572(2);  26 M.R.S. § 833(1).

Because Blethen lacks direct evidence of discriminatory animus, her claims are best evaluated by means of the burden-shifting paradigm prescribed by the Supreme Court in McDonnell Douglas Corporation v. Green, 411 U.S. 792, 802 (1973). This paradigm applies with respect to all of the statutes that undergird Blethen's action. See Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir. 2008) (Title VII and Section 1981); Fennel v. First Step Design, 83 F.3d 526, 535 (1st Cir. 1996) (Title VII, MHRA, and MWPA). Initially, the burden falls upon the plaintiff to make a prima facie showing, which entails a relatively light challenge. If the prima facie showing is made, a burden of production falls to the defendant to introduce a legitimate, non-discriminatory justification for the adverse employment action, which justification must be demonstrated through admissible evidence. If the defendant fails to do so, then the claim will go forward based on a presumption of discrimination, but if the defendant produces the necessary evidence, the burden then returns to the plaintiff, who must show that there is evidence of record that could permit the finder of fact to conclude, based on a preponderance of the evidence, that the defendant's justification is a pretext and that the evidence of pretext divulges a discriminatory or retaliatory motivation when considered alongside the prima facie evidence. Bhatti, 659 F.3d at 70; see also Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 143, 146-48 (2000); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993); Quinones v. Houser Buick, 436 F.3d 284, 289-90 (1st Cir. 2006). "The strength of the prima facie case and the significance of the disbelieved pretext will vary from case to case depending on the circumstances. In short, everything depends on the individual facts." Woods v. Friction Materials, Inc., 30 F.3d 255, 260 n.3 (1st Cir. 1994).

### 1. Prima facie case

MaineGeneral does not challenge Blethen's ability to make a prima facie showing in the context of her race discrimination claim but proceeds directly to pretext. (Mot. at 13.) However, MaineGeneral does take issue with aspects of Blethen's prima facie showing of retaliation. (Mot. at 21.) The discussion will start with the retaliation claim for this reason.

A prima facie showing entails: (1) membership in a protected class or engagement in protected activity; (2) job performance at an acceptable level; (3) termination or another adverse employment action; and (4) some evidence of causal connection between the first and third elements, such as replacement by another with similar qualifications. Bhatti, 659 F.3d at 70. As to the first element of the standard, Title VII prohibits discrimination in employment based on opposition to "any practice made an unlawful employment practice." 42 U.S.C. § 2000e-3(a). In this Circuit, participation in protected activity under Title VII extends to situations in which the employee has "'a good faith, reasonable belief that the underlying challenged actions' were unlawful." Collazo v. Bristol-Myers Squibb Mfg., 617 F.3d 39, 48 (1st Cir. 2010) (quoting Fantini v. Salem State Coll., 557 F.3d 22, 32 (1st Cir. 2009) (quoting Second Circuit precedent)). This is consistent with the standard applied in the context of the MHRA and the MWPA. 5 M.R.S. § 4572(1)(A), (E); 26 M.R.S. § 833. Presumably, Section 1981's retaliation standard is consistent with the Title VII standard.

MaineGeneral argues that "[t]he only protected activity preceding the termination occurred in the late Spring of 2009, when Blethen claims she told Knight about [A.X.'s] 'black ass' and 'slave' comments." (Mot. at 21.) Not so, says Blethen, referencing her communication with Knight in September 2009, when she told Knight "that H.Y. had yelled out while Blethen was providing care to her, referred to her as 'the Mexican girl' and that 'it made her feel bad

because the resident was reacting to her because of her race.'" (Pl.'s Opp'n at 16.)  According to Blethen, this communication was "obviously a communication opposing comments that Blethen perceived to be discriminatory, and thus protected activity." (Id.)  Blethen overreaches in this regard.  From an objective standpoint, H.Y.'s demonstrated fear and dissatisfaction with Blethen—even if irrational and racially motivated—and her reference to Blethen as the Mexican girl do not amount to something a reasonable person would regard as an act of unlawful harassment, given the non-threatening and dependent nature of the speaker.  Even the more offensive language used by A.X. does not reasonably rise to the level of being unlawful under federal or state anti-harassment law when the words are uttered by an elderly and dependent patient who has otherwise demonstrated a lack of grounding in reality and who has not been presented as threatening or intimidating in any way.  Such a patient presents a challenge for every care provider and Blethen does not supply any contextual support that would suggest why a reasonable person in her position would fairly regard A.X.'s behavior as unlawful discrimination or unlawful workplace harassment.  Even assuming for the sake of argument that A.X.'s statements could provide Blethen with reasonable ground to complain to her employer about "harassment," in the abstract, there is nothing in the record to suggest that A.X. was not an equal opportunity espouser of offensive viewpoints.  For example, it is admitted that she made a number of sexually inappropriate comments.  A reasonable person would not believe that her employer had exposed her to an unlawful work environment or that she was entitled to a different assignment because of A.X.'s offensive statements.

MaineGeneral's point, in any event, is that the latest possible protected activity was in spring 2009 when Blethen related to Knight A.X.'s more offensive statements.  MaineGeneral argues that Knight's termination recommendation four or five months later is temporally too

remote to support an inference of retaliation for purposes of the causation element of the prima facie test. (Mot. at 21.) Note, too, that even assuming that Blethen's report of H.Y.'s behavior on September 8, 2009, was also protected activity, the survey process had already commenced and had no relation to Blethen's earlier report and Fotter's follow-up interviews were also under way as of Blethen's talk with Knight on the eighth of September. MaineGeneral has a good argument on this issue, but the balance of this discussion will assume for the sake of argument that the relatively light prima facie burden is met and that protected activity occurred prior to Knight's termination recommendation and within sufficient temporal proximity to demonstrate prima facie causation, though the showing is weak.

### 2. Pretext assessment

Among the means of showing pretext is to show "'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons' such that a factfinder could 'infer that the employer did not act for the asserted non-discriminatory reasons.'" Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000) (quoting Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 168 (1st Cir. 1998)). MaineGeneral has introduced admissible evidence that Knight recommended Blethen's termination because he learned that multiple residents regarded Blethen's treatment as rough. Also germane to this recommendation, according to admissible evidence, was the fact that Knight had counseled Blethen in August 2009 in connection with the M.B./M.C. mechanical lift incidents about avoiding an approach to care that could be regarded as rough. Knight's recommendation was acted upon, initially, because Gallup, someone without knowledge of Blethen's complaints, gave him authorization. Thereafter, Boyink retracted the outright termination in her grievance decision, but eventually Gallup reclassified Blethen as resigned

after Blethen received some opportunity to pursue another position within MaineGeneral.  In

sum, MaineGeneral imposed a disciplinary sanction on Blethen based on multiple roughness

reports that followed upon a prior counseling on that same subject.  The ultimate sanction was a

severance of employment, classified as a resignation.

Blethen's burden is to show that the legitimate reasons offered for her severance from

employment are not worthy of credence and that MaineGeneral likely acted out of a

discriminatory or retaliatory bias against Blethen based on her race, color, national origin, or

what has been assumed to be protected activity.  MaineGeneral argues that the record does not

disclose unequal treatment or bias and that there are no real "weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions" in its explanation, let alone evidence of an

actual discriminatory or retaliatory motive.  (Mot. at 21.)  In response, Blethen argues that there

are four types of evidence suggesting pretext:  (1) deviation from policies and procedures; (2)

multiple inconsistencies concerning stated explanations; (3) disparate treatment; and (4) other

circumstantial evidence of animus.  (Pl.'s Opp'n at 18.)  These arguments are addressed in turn.

### a.  Deviation from policies

Blethen argues that pretext is suggested by the fact that Knight never made a report

concerning workplace harassment following Blethen's report of H.Y. and A.X.'s comments.

(Pl.'s Opp'n at 18-19.)  Assuming that the record establishes that Blethen reported these

statements to Knight in an effort to engage the wheels of MaineGeneral's anti-harassment policy

and procedure, Knight's failure to take the steps required of him, under the circumstances, does

not reasonably divulge any discriminatory or retaliatory bias on his part.  Blethen's second

argument about policy is that she believes she was not treated appropriately under

MaineGeneral's progressive discipline policy.  Knight's recommendation of "termination for

suspected abuse" does appear quite severe, particularly as "roughness" does not equate to

"abuse" under MaineGeneral's policy definition for the term.  However, Knight's

recommendation was to treat another employee, per diem worker V.L., equally as severely, if not

more severely given the absence of prior counseling.  Considering the significance of

MaineGeneral's responsibility to its elderly Gray Birch residents and the fact that a number of

them complained of roughness and focused their complaints on Blethen and V.L., Knight's

recommendation cannot fairly be regarded as irrational or illogical and the record does not

disclose any indication that Knight harbored discriminatory attitudes or ever responded

negatively to Blethen's complaints of her interactions with H.Y. or A.X.  Moreover, neither

Lamey nor Gallup ever suggested that this punishment was unduly severe in light of the nature of

the resident complaints.  Nor is there any indication that either of these decision makers harbored

discriminatory or retaliatory bias.  The record indicates that Lamey and Gallup were not aware of

Blethen's complaints concerning resident comments when they gave Knight permission to

terminate Blethen's employment.

Blethen emphasizes that Vice President Boyink later described the termination decision

as a "mistake" because she believed more counseling was warranted.  (Id. at 19-20.)  However,

Boyink's assessment does not reflect an inconsistency in relation to MaineGeneral's explanation

but one more step in the evolution of MaineGeneral's resolution of this particular concern.

Boyink's relative leniency is MaineGeneral's act as much as any other and the record simply

fails to shed any light suggesting that Blethen's race, color, national origin, or complaints about

H.Y. or A.X.'s offensive comments were treated as a negative factor in the decision making

process.

### b. Inconsistencies concerning stated explanations

Under this heading, Blethen argues that Knight falsified his account of resident complaints, in particular by indicating in his timeline and in his report to DHHS that Blethen said to H.Y.: "I hear you have been telling stories about me." Of all the alleged inconsistencies remarked upon by Blethen in her factual statements—recounted above under the heading "Knight's Characterization of Resident Reports"—the only one that gives pause is his belated revelation of the "telling stories" remark, which he had not recorded in his earlier written notes and reports. If true, or if credited by Boyink, such a remark would be likely to have a strong negative impact on Blethen's grievance outcome. However, the record does not disclose that Boyink credited this assertion or that it otherwise factored into her resolution of the grievance. For purposes of summary judgment, the proper assessment of the record is that Blethen did not make this statement to H.Y. and that Knight was introducing the allegation in an attempt to undermine Blethen's grievance and support his own termination recommendation. The difficulty lies in determining the significance this potential inference would have for the finder of fact. Viewed in light of the entire record, I conclude that this disputed fact does not raise a genuine issue of pretext or otherwise divulge unlawful animus because it does not render false Knight's stated rationale for recommending termination and because the ultimate decision on Blethen's grievance does not indicate that the decision maker placed any weight on the telling stories allegation.

### c. Disparate treatment

Blethen contends that per diem employee V.L., a Caucasian, received preferential treatment because Knight's recommendation to terminate V.L. was not accepted the way the recommendation to terminate her own employment was. (Pl.'s Opp'n at 21.) However, the

record reflects that it was the first time allegations of roughness were raised in relation to V.L. and that, when additional reports surfaced in December 2009, the decision was to discontinue calling V.L. and to classify her as resigned.  In other words, V.L. received the same initial treatment as Blethen, an employee discussion form, and the same sanction ultimately received by Blethen upon the second report, resignation.  If V.L. had received harsher treatment upon first report or second report, then she too might have complained of disparate treatment.  V.L. did avoid the unpleasantness of a notice saying she was terminated for suspected abuse, but the treatment she received following a second report took place in light of the treatment ultimately provided to Blethen.

Blethen suggests that V.L. actually had a disciplinary record before Fotter's September interviews and that it involved resident R.H. (Pl.'s Opp'n at 21), but the presentation of the record given by the parties reflects that these allegations surfaced with Fotter's interviews and not before.  Blethen also contends that the complaint at issue, which she describes as "slapping," was more severe misconduct than roughness, but she omits language reflecting that V.L. reportedly slapped R.H. "on the back," which presents the slapping issue in an entirely different light.

### d.   Other

Blethen argues that Knight may well have recommended firing V.L. only to mask his discriminatory or retaliatory bias against Blethen.  (Pl.'s Opp'n at 22.)  This is conceivable, but the evidentiary record does not reasonably support that kind of inference.  Moreover, the resolution of the disciplinary question was not ultimately the one advanced by Knight.  The actual decision to address the roughness complaints against Blethen and V.L. on parallel tracks,

but not simultaneously, is explained by a non-discriminatory factor:  V.L. had not yet been counseled as had Blethen.

Blethen also contends that MaineGeneral has shifted its narrative about who the relevant decision makers were by inserting HR Vice President Lamey into the ultimate decision to classify Blethen as having resigned effective November 30.  Blethen objects to assigning Lamey any responsibility for this decision because Gallup signed MaineGeneral's responses to Blethen's first interrogatories responses and indicated therein that Gallup "made the decision to change Plaintiff's status to 'resignation.'"  (ECF No. 69-4 at 6-7, Interrog. no. 9.)  Blethen complains that crediting Lamey's and Gallup's summary judgment declarations would condone a discovery violation, both for this reason and because Lamey was not identified as a witness in MaineGeneral's initial disclosures.  (Opp. St. ¶ 151.)  On the other hand, she has not denied that Gallup consulted with Lamey prior to the decision.  (Opp. St. ¶ 150.)  MaineGeneral's inclusion of Lamey as a decision maker in relation to the resignation classification is a slight change of tune, but it is not one that discloses any pretext or bias.  MaineGeneral explains that it does not have a policy of leaving employees in an undetermined employment status indefinitely and the record does not disclose any improper motive behind the ultimate imposition of a resignation with eligibility for rehire.  To this Blethen rejoins that the failure to regard her as on "inactive status leave" and the unprecedented nature of her indeterminate status only reinforce her claim. (Pl.'s Opp'n at 23-24.)

The difficulty for Blethen, once more, is that the evidence does not divulge pretext but rather an evolving employment determination made in light of gradually unfolding events and circumstances.  MaineGeneral's treatment of Blethen was not entirely at odds with its grievance procedure as there was a revision of discipline and a change in Blethen's file from termination to

resignation.  Moreover, whether Gallup made the decision at Lamey's direction or based on her discussion with Lamey about the difficulty of leaving Blethen in an indeterminate status indefinitely, there is simply no evidence that Gallup or Lamey harbored discriminatory or retaliatory motives.  Gallup and Lamey have offered statements to the effect that the ordinary thing would have been for Blethen, as a successful grievant, to return to her former position.  (Am. Stmt. ¶ 146.)  However, Blethen indicated in her grievance that she did not want to return to Gray Birch and has reinforced that assertion with testimony to the effect that she considered the facility to be a hostile work environment.  Given the circumstances, the reclassification of Blethen as resigned and eligible for rehire does not reasonably present as a measure designed to retaliate for protected activity (assuming protected activity is established) or discriminate on the basis of race, color, or national origin.

### 3.  Additional considerations regarding race, color, or national origin

On the specific question of whether the record discloses evidence of discrimination based on race, color, or national origin, as distinct from retaliation, Blethen argues that "[a] jury could infer that the terminations of Blethen's employment were motivated by discriminatory animus based on Knight's and Gallup's failures to address Blethen's complaints in accordance with MaineGeneral policy" and based on the fact that Blethen's national origin was acknowledged by Knight in an email concerning his termination recommendation and the concern that Blethen might pursue a discrimination claim if MaineGeneral did not also terminate V.L.[21]  (Pl.'s Opp'n

---

[21]     Blethen also asserts that the record shows disparate treatment toward D.C., a Hispanic worker who received a "documented counseling" based on a coworker's assessment concerning roughness, as compared to V.L., the Caucasian nurse who also received documented counseling, but whom Blethen describes as "hav[ing] engaged in far more egregious conduct of deliberately slapping a resident."  (Pl.'s Opp'n at 25.)  The record reflects a complaint by a male resident that V.L. slapped him on the back.  It would be speculative to assume that this described a heightened degree of roughness.

Blethen also says she experienced disparate treatment in the form of "unwarranted discipline . . . in 2008."  (Id.)  This is a reference to the call-bell incident, which does not demonstrate disparate treatment and has no apparent relation to the controversy a year later concerning the roughness allegations.  Even assuming the discipline

at 25.)  The failure to treat Blethen's reports concerning offensive statements as calling for an anti-harassment response is understandable and not indicative of racial bias or pretext.  The residents involved in Blethen's reports, according to Blethen, were A.X. and H.Y., though it appears to have been H.Y.'s remarks that motivated Blethen to speak to Knight.  Given the context, the residents involved, and the fact that their statements are more pitiable than anything else, Knight's failure to perceive the report as requiring anti-harassment measures does not support an inference that his inaction was the product of race-based animus toward Blethen.  As for Knight's email correspondence with his superiors in which he indicates his concern that Blethen would consider herself to be the victim of discrimination, it reflects just that, a concern for Blethen's subjective interpretation in light of her complaint about H.Y.'s "Mexican girl" descriptor, not an aspersion based on race, color, or national origin.  Ultimately, as is the case with Blethen's retaliation theory, even if these circumstances are sufficient to meet the minimal burden of the prima facie standard, they do not demonstrate that MaineGeneral's handling of the roughness allegations and related disciplinary question were designed to mask race, color, or national origin discrimination.

## CONCLUSION

For the reasons set forth above, I RECOMMEND that the Court GRANT Defendant's Motion for Summary Judgment (ECF No. 23).

---

was "unwarranted," as Blethen describes it, there is no appearance in the record that she was treated unfairly because of race, color, or national origin.  Her testimony reflects that the resident in question had "VIP" status.

**NOTICE**

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

August 1, 2012